## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSHI LIVING TRUST, Individually and on behalf of all others similarly situated, | Case No: |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | JURY TRIAL DEMANDED |
| AKORN, INC., RAJAT RAI, DUANE A. PORTWOOD, and RANDALL E. POLLARD, | |
| Defendants. | |

Plaintiff Joshi Living Trust ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Akorn, Inc. ("Akorn" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded securities of Akorn from March 1, 2017 through February 26, 2018,

inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company conducts business and is headquartered in this District.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the attached Certification, acquired Akorn securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.     Defendant Akorn develops, manufactures, and markets specialized generic and branded pharmaceuticals, over-the-counter drug products, and animal health products in the United States and internationally. Akorn is a Louisiana corporation with its headquarters located

at 1925 W. Field Court, Suite 300, Lake Forrest, Illinois 60045. Akorn securities trade on the NASDAQ under the ticker symbol "AKRX."

8.     Defendant Rajat Rai ("Rai") has been the Company's Chief Executive Officer ("CEO") since May 21, 2010. He was also Akorn's Interim CEO from March 2, 2009 to May 21, 2010.

9.     Defendant Duane A. Portwood ("Portwood") has been the Company's Chief Financial Officer ("CFO") and Executive Vice President since October 30, 2015.

10.    Defendant Randall E. Pollard ("Pollard") has been the Company's Chief Accounting Officer ("CAO") since August 2015, and Senior Vice President and Corporate Controller since April 2015.

11.    Defendants Rai, Portwood and Pollard are sometimes referred to herein as the "Individual Defendants."

12.    Each of the Individual Defendants:

a.   directly participated in the management of the Company;

b.   was directly involved in the day-to-day operations of the Company at the highest levels;

c.   was privy to confidential proprietary information concerning the Company and its business and operations;

d.   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

3

f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.  approved or ratified these statements in violation of the federal securities laws.

13.    Akorn is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

14.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Akorn under *respondeat superior* and agency principles.

15.    Defendant Akorn and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

16.    On April 24, 2017, it was announced that Fresenius SE & Co. KGaA ("Fresenius") agreed to acquire Akorn. The transaction was expected to close by early 2018.

### Materially False and Misleading Statements Issued During the Class Period

17.    On March 1, 2017, Akorn filed an annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's annual financial results and position. The 2016 10-K was signed by Defendants Rai, Portwood and Pollard. The 2016 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Rai and Portwood attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

4

18.    The 2016 10-K discussed the Company's compliance with FDA regulations and

Good Manufacturing Practices, stating in relevant part:

**Government Regulation**

Pharmaceutical manufacturers and distributors are subject to extensive regulation by government agencies, including the FDA, the Drug Enforcement Administration ("DEA"), the FTC and other federal, state and local agencies. The development, testing, manufacturing, processing, quality, safety, efficacy, packaging, labeling, recordkeeping, distribution, storage and advertising of our products, and disposal of waste products arising from such activities, are subject to regulation by the FDA, DEA, FTC, the Consumer Product Safety Commission, the Occupational Safety and Health Administration and the Environmental Protection Agency. Similar state and local agencies also have jurisdiction over these activities. ***Noncompliance with applicable United States and/or state or local regulatory requirements can result in fines, injunctions, penalties, mandatory recalls or seizures, suspensions of production, recommendations by the FDA against governmental contracts and criminal prosecution***. In addition, we are subject to oversight from federal and state government benefit programs, healthcare fraud and abuse laws and international regulations in jurisdictions in which we manufacture or sell our pharmaceutical products.

***FDA.*** The Federal Food, Drug and Cosmetic Act (the "FDC Act"), the Controlled Substance Act and other federal statutes and regulations govern or influence the development, testing, manufacture, labeling, storage and promotion of products that we manufacture and market. ***The FDA inspects drug manufacturers and storage facilities to determine compliance with its current Good Manufacturing Practices ("cGMP") regulations, non-compliance with which can result in fines, recall and seizure of products, total or partial suspension of production, refusal to approve NDAs and ANDAs and criminal prosecution.*** Under the FDC Act, the federal government has extensive administrative and judicial enforcement authority over the activities of finished drug product manufacturers to ensure compliance with FDA regulations. This authority includes, but is not limited to, the authority to initiate judicial action to seize unapproved or non-complying products, to enjoin non-complying activities, to halt manufacturing operations that are not in compliance with cGMP, to recall products, to seek civil and monetary penalties and to criminally prosecute violators. Other enforcement activities include refusal to approve product applications, withdrawal of previously approved applications or prohibition on marketing of certain unapproved products.

FDA approval is required before any prescription drug products can be marketed. New drugs require the filing of an NDA, including clinical studies demonstrating the safety and efficacy of the drug. Generic drugs, which are therapeutic equivalents of existing, brand name drugs, require the filing of an ANDA. An

ANDA does not, for the most part, require clinical studies since safety and efficacy have already been demonstrated by the product originator. However, the ANDA must, for example, provide data to support the bioequivalence of the generic drug product. The time required by the FDA to review and approve NDAs and ANDAs is variable and, to a large extent, beyond our control.

***In 2016, all of our FDA approved facilities were inspected and ultimately received satisfactory status from the FDA.***

\*     \*     \*

Risks Related to Regulations

We are subject to extensive government regulations which if they change and or we are not in compliance with, could increase our costs, subject us to various obligations and fines, or prevent us from selling our products or operating our facilities.

\*     \*     \*

***We and our third-party manufacturers are subject to periodic inspection by the FDA to assure regulatory compliance regarding the manufacturing, distribution, and promotion of pharmaceutical products.*** The FDA imposes stringent mandatory requirements on the manufacture and distribution of pharmaceutical products to ensure their safety and efficacy. The FDA also regulates drug labeling and the advertising of prescription drugs. A finding by a governmental agency or court that we are not in compliance with FDA requirements could have a material adverse effect on our business, financial condition and results of operations.

(emphasis added).

19.     On May 4, 2017, the Company filed a Form 10-Q for the quarter ended March 31, 2017 (the "1Q 2017 10-Q") with the SEC, which provided the Company's first quarter 2017 financial results and position. The 1Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of March 31, 2017. The 1Q 2017 10-Q was signed by Defendant Portwood.

20.     The 1Q 2017 10-Q contained signed SOX certifications by Defendants Rai and Portwood attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

21.     The 1Q 2017 10-Q discussed risk factors concerning the merger with Fresenius,

stating in relevant part:

**There are material uncertainties and risks associated with the proposed Merger Agreement and Merger.**

On April 24, 2017, we signed the Merger Agreement with Fresenius Kabi. Below are material uncertainties and risks associated with the Merger Agreement and the proposed Merger. If any of the risks develop into actual events, then our business, financial condition, results and ongoing operations, stock price or prospects could be materially adversely affected.

- The announcement or pendency of the Merger may impede Akorn's ability to retain and hire key personnel, its ability to maintain relationships with its customers, suppliers and others with whom it does business, or its operating results and business generally;
- The attention of our employees and management may be diverted due to activities related to the Merger, which may affect our business operations;
- Matters relating to the transactions (including integration planning) may require substantial commitments of time and resources by Akorn management, which could harm our relationships with our employees, customers, distributors, suppliers or other business partners, and may result in a loss of or a substantial decrease in purchases by our customers;
- The Merger Agreement restricts us from engaging in certain actions without the approval of Fresenius Kabi, which could prevent us from pursuing certain business opportunities outside the ordinary course of business that arise prior to the closing of the Merger;
- The Merger Agreement contains provisions that could discourage a potential competing acquirer of Akorn;
- The directors and executive officers of Akorn have interests in the Merger that may be different from, or in addition to, those of other Akorn shareholders, which could have influenced their decisions to support or approve the Merger; and
- Shareholder litigation in connection with the transactions contemplated by the Merger Agreement may result in significant costs of defense, indemnification and liability.

**The proposed Merger may not be completed in a timely manner or at all.**

Completion of the Merger is subject to customary closing conditions, including (1) the approval of the Merger Agreement by the affirmative vote of the holders of at least a majority of all outstanding shares, (2) there being no judgment or law enjoining or otherwise prohibiting the consummation of the Merger, (3) the expiration of the waiting period applicable to the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. The obligation of each of the Company and Fresenius Kabi to consummate the Merger is also

conditioned on the other party's representations and warranties being true and correct (subject to certain materiality exceptions) and the other party having performed in all material respects its obligations under the Merger Agreement. There is no assurance that the required stockholder and regulatory approvals will be obtained, nor that the required closing conditions will be satisfied, and no assurance can be given as to the terms, conditions and timing of any approvals. Competing offers or acquisition proposals for Akorn may be made, resulting in delay of the Merger or termination of the Merger Agreement. Lawsuits have been filed and threatened against Akorn relating to the Merger and an adverse ruling in any such lawsuit may prevent the Merger from being completed in the time frame expected or at all. If the Merger is delayed or not completed, we may suffer a number of consequences, including a decline in our share price to the extent that the current price of our common stock reflects an assumption that the merger will be completed; negative publicity and a negative impression of us in the investment community and loss of business opportunities. Further, we have incurred, and will continue to incur, significant costs, expenses and fees for professional advisors, printing and other transaction costs in connection with the Merger, and these fees and costs are payable by us regardless of whether the Merger is consummated. In some cases, a termination of the Merger Agreement will require Akorn to pay Fresenius Kabi a termination fee and additional expenses. In addition, Akorn could be subject to litigation related to any failure to consummate the Merger or any related action that could be brought to enforce a party's obligation under the Merger Agreement.

22.     On July 31, 2017, the Company filed a Form 10-Q for the quarter ended June 30, 2017 (the "2Q 2017 10-Q") with the SEC, which provided the Company's second quarter 2017 financial results and position. The 2Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of June 30, 2017. The 2Q 2017 10-Q was signed by Defendant Portwood.

23.     The 2Q 2017 10-Q contained signed SOX certifications by Defendants Rai and Portwood attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

24.     The 2Q 2017 10-Q discussed risk factors concerning the merger with Fresenius, stating in relevant part:

> **There are material uncertainties and risks associated with the proposed Merger Agreement and Merger.**

On April 24, 2017, we signed the Merger Agreement with Fresenius Kabi. Below are material uncertainties and risks associated with the Merger Agreement and the proposed Merger. If any of the risks develop into actual events, then our business, financial condition, results and ongoing operations, stock price or prospects could be materially adversely affected.

- The announcement or pendency of the Merger may impede Akorn's ability to retain and hire key personnel, its ability to maintain relationships with its customers, suppliers and others with whom it does business, or its operating results and business generally;
- The attention of our employees and management may be diverted due to activities related to the Merger, which may affect our business operations;
- Matters relating to the transactions (including integration planning) may require substantial commitments of time and resources by Akorn management, which could harm our relationships with our employees, customers, distributors, suppliers or other business partners, and may result in a loss of or a substantial decrease in purchases by our customers;
- The Merger Agreement restricts us from engaging in certain actions without the approval of Fresenius Kabi, which could prevent us from pursuing certain business opportunities outside the ordinary course of business that arise prior to the closing of the Merger;
- The Merger Agreement contains provisions that could discourage a potential competing acquirer of Akorn;
- The directors and executive officers of Akorn have interests in the Merger that may be different from, or in addition to, those of other Akorn shareholders, which could have influenced their decisions to support or approve the Merger; and
- Shareholder litigation in connection with the transactions contemplated by the Merger Agreement may result in significant costs of defense, indemnification and liability.

**The proposed Merger may not be completed in a timely manner or at all.**

Completion of the Merger is subject to customary closing conditions, including (1) the approval of the Merger Agreement by the affirmative vote of the holders of at least a majority of all outstanding shares, (2) there being no judgment or law enjoining or otherwise prohibiting the consummation of the Merger, (3) the expiration of the waiting period applicable to the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. The obligation of each of the Company and Fresenius Kabi to consummate the Merger is also conditioned on the other party's representations and warranties being true and correct (subject to certain materiality exceptions) and the other party having performed in all material respects its obligations under the Merger Agreement. There is no assurance that the required regulatory approvals will be obtained, nor that the required closing conditions will be satisfied, and no assurance can be given as to the terms, conditions and timing of any approvals. Competing offers

or acquisition proposals for Akorn may be made, resulting in delay of the Merger or termination of the Merger Agreement. Lawsuits have been filed and threatened against Akorn relating to the Merger and an adverse ruling in any such lawsuit may prevent the Merger from being completed in the time frame expected or at all. If the Merger is delayed or not completed, we may suffer a number of consequences, including a decline in our share price to the extent that the current price of our common stock reflects an assumption that the merger will be completed; negative publicity and a negative impression of us in the investment community and loss of business opportunities. Further, we have incurred, and will continue to incur, significant costs, expenses and fees for professional advisors, printing and other transaction costs in connection with the Merger, and these fees and costs are payable by us regardless of whether the Merger is consummated. In some cases, a termination of the Merger Agreement will require Akorn to pay Fresenius Kabi a termination fee and additional expenses. In addition, Akorn could be subject to litigation related to any failure to consummate the Merger or any related action that could be brought to enforce a party's obligation under the Merger Agreement.

25.     On November 1, 2017, the Company filed a Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q") with the SEC, which provided the Company's third quarter 2017 financial results and position. The 3Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of September 30, 2017. The 3Q 2017 10-Q was signed by Defendant Portwood.

26.     The 3Q 2017 10-Q contained signed SOX certifications by Defendants Rai and Portwood attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

27.     The 3Q 2017 10-Q discussed risk factors concerning the merger with Fresenius, stating in relevant part:

**There are material uncertainties and risks associated with the proposed Merger Agreement and Merger.**

On April 24, 2017, we signed the Merger Agreement with Fresenius Kabi. Below are material uncertainties and risks associated with the Merger Agreement and the proposed Merger. If any of the risks develop into actual events, then our business, financial condition, results and ongoing operations, stock price or prospects could be materially adversely affected.

- The announcement or pendency of the Merger may impede Akorn's ability to retain and hire key personnel, its ability to maintain relationships with its customers, suppliers and others with whom it does business, or its operating results and business generally;
- The attention of our employees and management may be diverted due to activities related to the Merger, which may affect our business operations;
- Matters relating to the transactions (including integration planning) may require substantial commitments of time and resources by Akorn management, which could harm our relationships with our employees, customers, distributors, suppliers or other business partners, and may result in a loss of or a substantial decrease in purchases by our customers;
- The Merger Agreement restricts us from engaging in certain actions without the approval of Fresenius Kabi, which could prevent us from pursuing certain business opportunities outside the ordinary course of business that arise prior to the closing of the Merger;
- The Merger Agreement contains provisions that could discourage a potential competing acquirer of Akorn;
- The directors and executive officers of Akorn have interests in the Merger that may be different from, or in addition to, those of other Akorn shareholders, which could have influenced their decisions to support or approve the Merger; and
- Shareholder litigation in connection with the transactions contemplated by the Merger Agreement may result in significant costs of defense, indemnification and liability.

**The proposed Merger may not be completed in a timely manner or at all.**

Completion of the Merger is subject to customary closing conditions, including (1) the approval of the Merger Agreement by the affirmative vote of the holders of at least a majority of all outstanding shares, (2) there being no judgment or law enjoining or otherwise prohibiting the consummation of the Merger, (3) the expiration of the waiting period applicable to the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. The obligation of each of the Company and Fresenius Kabi to consummate the Merger is also conditioned on the other party's representations and warranties being true and correct (subject to certain materiality exceptions) and the other party having performed in all material respects its obligations under the Merger Agreement. There is no assurance that the required regulatory approvals will be obtained, nor that the required closing conditions will be satisfied, and no assurance can be given as to the terms, conditions and timing of any approvals. Competing offers or acquisition proposals for Akorn may be made, resulting in delay of the Merger or termination of the Merger Agreement. Lawsuits have been filed and threatened against Akorn relating to the Merger and an adverse ruling in any such lawsuit may prevent the Merger from being completed in the time frame expected or at all. If the Merger is delayed or not completed, we may suffer a number of consequences, including a decline in our share price to the extent that the current

price of our common stock reflects an assumption that the merger will be completed; negative publicity and a negative impression of us in the investment community and loss of business opportunities. Further, we have incurred, and will continue to incur, significant costs, expenses and fees for professional advisors, printing and other transaction costs in connection with the Merger, and these fees and costs are payable by us regardless of whether the Merger is consummated. In some cases, a termination of the Merger Agreement will require Akorn to pay Fresenius Kabi a termination fee and additional expenses. In addition, Akorn could be subject to litigation related to any failure to consummate the Merger or any related action that could be brought to enforce a party's obligation under the Merger Agreement.

28.     The statements referenced in ¶¶17-27 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Akorn's failure to comply with FDA data integrity requirements would jeopardize Fresenius's acquisition of Akorn; (2) the Company lacked effective internal controls over financial reporting; and (3) as a result, the Company's financial statements were materially false and misleading at all relevant times.

**The Truth Emerges**

29.     On February 26, 2018, Fresenius announced it is conducting an investigation into alleged breaches of FDA data integrity requirements at Akorn. Fresenius also stated that consummation of the transaction may be affected if the closing conditions under the merger agreement are not met:

INVESTIGATION AT AKORN, INC.

Fresenius is conducting an independent investigation, using external experts, into alleged breaches of FDA* data integrity requirements relating to product development at Akorn, Inc.

The Management and Supervisory Boards of Fresenius will assess the findings of that investigation. The consummation of the transaction may be affected if the

closing conditions under the merger agreement are not met. Fresenius does not intend to provide further updates as the investigation proceeds.

Fresenius continues to seek FTC clearance.

30.     On this news, the Company's shares fell $11.63 per share or over 38% to close at $18.65 per share on February 27, 2018, damaging investors.

31.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Akorn securities publically traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Akorn securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Akorn or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Akorn;

c.      whether the Individual Defendants caused Akorn to issue false and misleading financial statements during the Class Period;

d.      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.      whether the prices of Akorn securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

38.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      the omissions and misrepresentations were material;

c.      Akorn securities are traded in an efficient market;

d.      the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.      the Company traded on the NASDAQ and was covered by multiple analysts;

f.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.      Plaintiff and members of the Class purchased, acquired and/or sold Akorn securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

39.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

40.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

<u>**COUNT I**</u>

**Violations of Section 10(b) of The Exchange Act and Rule 10b-5**
<u>**Against All Defendants**</u>

41.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

43.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Akorn securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Akorn securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

16

44. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Akorn securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Akorn's finances and business prospects.

45. By virtue of their positions at Akorn, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

46. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Akorn securities from their personal portfolios.

47. Akorn showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Akorn, the Individual Defendants had knowledge of the details of Akorn's internal affairs.

48.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Akorn. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Akorn's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Akorn securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Akorn's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Akorn securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

49.     During the Class Period, Akorn securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Akorn securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Akorn securities was substantially lower than the prices paid by Plaintiff and the

other members of the Class. The market price of Akorn securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

50.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

51.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### Violations of Section 20(a) of The Exchange Act
### Against The Individual Defendants

52.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

53.     During the Class Period, the Individual Defendants participated in the operation and management of Akorn, and conducted and participated, directly and indirectly, in the conduct of Akorn's business affairs. Because of their senior positions, they knew the adverse non-public information about Akorn's current financial position and future business prospects.

54.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Akorn's business practices, and to correct promptly any public statements issued by Akorn which had become materially false or misleading.

55.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which Akorn disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Akorn to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Akorn within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Akorn securities.

56.     Each of the Individual Defendants, therefore, acted as a controlling person of Akorn. By reason of their senior management positions and/or being directors of Akorn, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Akorn to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Akorn and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

57.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Akorn.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: March 8, 2018                    Respectfully submitted,

                                        **HEFFNER HURST**

                                        */s/ Matthew Heffner*
                                        Matthew T. Heffner
                                        Matthew T. Hurst
                                        30 North LaSalle Street
                                        Twelfth Floor
                                        Chicago, Illinois 60602
                                        Telephone: (312) 346-3466
                                        Fax: (312) 346-2829
                                        Email: mheffner@heffnerhurst.com
                                        Email: mhurst@heffnerhurst.com

                                        **THE ROSEN LAW FIRM, P.A.**
                                        Laurence M. Rosen, Esq.
                                        Phillip Kim, Esq.
                                        275 Madison Ave, 34th Floor
                                        New York, NY 10016
                                        Telephone: (212) 686-1060
                                        Fax: (212) 202-3827
                                        Email: lrosen@rosenlegal.com
                                        Email: pkim@rosenlegal.com

                                        *Counsel for Plaintiff*

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Akorn, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Akorn, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Utpal
**Middle initial:**
**Last name:** Joshi
**Entity:** Joshi Living Trust
**Title:** Trustee
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 02/05/2018 | 3300 | 32.10 |

7. I have not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below. [ ]

**Certification for Utpal Joshi (cont.)**

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:        **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.        **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform
Electronic Transactions Act as adopted by the various states and territories of the
United States.

Date of signing: 03/07/2018