## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE AKORN, INC. DATA INTEGRITY
SECURITIES LITIGATION

Civ. A. No. 1:18-cv-01713

Hon. Matthew F. Kennelly

LEAVE TO FILE EXCESS PAGES
GRANTED ON JUNE 4, 2019

## MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Avi Josefson
John Rizio-Hamilton (*admitted pro hac vice*)
Abe Alexander (*admitted pro hac vice*)
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
875 North Michigan Avenue
Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com
johnr@blbglaw.com
abe.alexander@blbglaw.com

*Liaison Counsel for the Class*

Andrew J. Entwistle
**ENTWISTLE & CAPPUCCI LLP**
500 W. 2nd Street, Suite 1900-16
Austin, Texas 78701
Telephone: (512) 710-5960
aentwistle@entwistle-law.com

  -and-

Joshua K. Porter (*admitted pro hac vice*)
Brendan J. Brodeur (*admitted pro hac vice*)
Andrew M. Sher (*admitted pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 20th Floor
New York, New York 10171
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
jporter@entwistle-law.com
bbrodeur@entwistle-law.com
asher@entwistle-law.com

*Lead Counsel for the Class*

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF ALLEGATIONS COMMON TO THE CLASS ...................................... 3

III.    ARGUMENT ...................................................................................................... 5

        A.    The Action Satisfies The Requirements Of Rule 23(a) ........................................ 5

              1.    Numerosity Is Established ........................................................... 6

              2.    Commonality Is Established ........................................................ 6

              3.    Typicality Is Established ............................................................ 7

              4.    Adequacy Is Established ............................................................ 8

        B.    The Action Satisfies The Requirements Of Rule 23(b)(3) ................................ 10

              1.    Predominance Is Established .................................................... 10

                    i.     High Trading Volume Supports Market Efficiency
                           (*Cammer* Factor 1) ......................................................... 13

                    ii.    Extensive Analyst Coverage Supports Market Efficiency
                           (*Cammer* Factor 2) ......................................................... 14

                    iii.   Akorn's NASDAQ Listing And Numerous Market Makers
                           Supports Market Efficiency (*Cammer* Factor 3) ...................... 14

                    iv.    Akorn's Eligibility To File An SEC Form S-3 Supports
                           Market Efficiency (*Cammer* Factor 4) ................................. 15

                    v.     The Price Of Akorn Stock Reacted To New, Company-
                           Specific Information (*Cammer* Factor 5) ............................. 15

                    vi.    Other Considerations Support Market Efficiency ...................... 16

              2.    Superiority Is Established Under Rule 23(b)(3) ........................... 17

        C.    The Court Should Approve Lead Counsel As Class Counsel ............................ 19

IV. CONCLUSION .................................................................................................. 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................. 10

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ........................................................................ 5, 10, 11

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .................................................................................. 12

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) .................................................................... 12

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .................................................. 13, 14, 15

*City of Miami Gen. Emps.' & Sanitation Emps' Ret. Tr. v. RH, Inc.*,
  No. 17-cv-00554-YGR, 2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) ........................ 12

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................ 11, 12

*Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"),
  563 U.S. 804 (2011) ............................................................................ 10, 11

*Fox v. Riverview Realty Partners*,
  No. 12 C 9350 2014 WL 1613022 (N.D. Ill. Apr. 22, 2014) (Kennelly, J.) ........... 6, 10, 12

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
  212 F.R.D. 400 (E.D. Wis. 2002) .............................................................. 17

*Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"),
  573 U.S. 258 (2014) ...................................................................... 12, 13, 16

*In re Bank One Sec. Litig./First Chicago S'holder Claims*,
  No. 00 CV 0767, 2002 WL 989454 (N.D. Ill. May 14, 2002) ................................ 11, 18

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ................................................................ 12

*In re Groupon, Inc. Sec. Litig.*,
  No. 12 CV 2450, 2014 WL 5245387 (N.D. Ill. Sept. 23, 2014) ......................... passim

*In re Neopharm, Inc. Sec. Litig.*,
  225 F.R.D. 563 (N.D. Ill. 2004) ......................................................... 6, 7, 8

*In re Northfield Labs.*,
No. 06 C 1493, 2012 WL 366852 (N.D. Ill. 2012)........................................................... 14

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) .................................................................................... 17

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) .......................................................................................... 10

*Ong v. Sears, Roebuck & Co.*,
459 F. Supp. 2d 729 (N.D. Ill. 2006) .............................................................................. 11

*Pope v. Harvard Bancshares, Inc.*,
240 F.R.D. 383 (N.D. Ill. 2006).......................................................................................... 18

*Retired Chicago Police Ass'n v. City of Chicago*,
7 F.3d 584 (7th Cir. 1993) ................................................................................................ 8

*Roth v. Aon Corp.*,
238 F.R.D. 603 (N.D. Ill. 2006)................................................................................... 1, 7

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) (Easterbrook, J.)........................................................ passim

*Silversman v. Motorola, Inc.*,
259 F.R.D. 163 (N.D. Ill. 2009)..................................................................................... 7, 8

*Tatz v. Nanophase Techs. Corp.*,
No. 01 C 8440, 2003 WL 21372471 (N.D. Ill. Jun. 12, 2003) ................................. passim

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) ......................................................................................... 16

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018).................................... 15

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)........................................................................................................... 7

*Washtenaw Cty. Emps.' Ret. Sys. v. Walgreen Co.*,
No. 15-cv-3187, 2018 WL 1535156 (N.D. Ill. Mar. 29, 2018) ................................ passim

**Rules**

Fed. R. Civ. P. 23 .......................................................................................................... passim

**Other Authorities**

H.R. Rep. No. 104-369 (1995) (Conf. Rep.),
     as *reprinted in* 1995 U.S.C.C.A.N. 730 ............................................................................ 9

Lead Plaintiffs Gabelli & Co. Investment Advisors, Inc. and Gabelli Funds, LLC ("Lead Plaintiffs" or "Gabelli") respectfully submit this Memorandum of Law in support of their motion, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, to: (i) certify this action against Defendants[1] as a class action on behalf of a class of all persons and entities who purchased or otherwise acquired Akorn's common stock between November 3, 2016 and January 8, 2019, inclusive (the "Class Period"), and were damaged thereby (the "Class"); (ii) appoint Gabelli as the Class representatives; and (iii) approve Gabelli's selection of Entwistle & Cappucci LLP ("Entwistle & Cappucci") as counsel for the Class and Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Class Liaison Counsel pursuant to Rule 23(g).

## I.    INTRODUCTION

This securities fraud action, which asserts claims against Defendants under Sections 10(b) and 20(a) of the Exchange Act arising from their misstatements and omissions of material facts about Akorn's regulatory compliance, is well-suited for class treatment under Rule 23. "It is established law in the Northern District of Illinois and the Seventh Circuit that class certifications are the preferred method of dealing with securities fraud cases." *Roth v. Aon Corp.*, 238 F.R.D. 603, 605 (N.D. Ill. 2006) ; *see also Washtenaw Cty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15-cv-3187, 2018 WL 1535156, at *2 (N.D. Ill. Mar. 29, 2018) ("Rule 23's requirements . . . have historically been liberally construed in favor of maintaining securities fraud class actions.").[2] "Courts in this district recognize that securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits. The class action is thus a useful device in which to litigate similar claims as well as an efficient

---

[1] "Defendants" are Akorn, Inc ("Akorn" or the "Company"), former CEO Rajat Rai ("Rai"), CFO Duane Portwood ("Portwood"), and Akorn Board members Alan Weinstein, Brian Tambi and Ronald Johnson.

[2] All emphasis herein is added and internal citations and punctuation omitted unless otherwise noted.

deterrent against corporate wrongdoing." *Tatz v. Nanophase Techs. Corp*., No. 01 C 8440, 2003 WL 21372471, at *2 (N.D. Ill. Jun. 13, 2003). As the Seventh Circuit has explained: "[w]hen a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action." *Schleicher v. Wendt*, 618 F.3d 679, 681-82 (7th Cir. 2010) (Easterbrook, J.). Hence, in securities actions, "class certification is routine." *Id*.

Pursuant to Rule 23(a) and (b)(3), Lead Plaintiffs seek to certify this action as a class action on behalf of:

> all persons and entities who purchased or otherwise acquired Akorn's common stock between November 3, 2016 and January 8, 2019, inclusive, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) other former and current directors and officers of Akorn, including their families and affiliates; (iii) any investment funds, companies, partnerships, trusts or other entities controlled by or benefitting such excluded parties; and (iv) the legal representatives, heirs, successors or assigns of any such excluded party (the "Class").

This securities action easily satisfies Rule 23(a)'s requirements for class certification: numerosity, commonality, typicality and adequacy. The numerosity requirement is satisfied because hundreds if not thousands of shareholders purchased Akorn's common stock during the Class Period and were damaged by Defendants' conduct. Lead Plaintiffs are also "typical" and "adequate," as their claims and interests are closely aligned with those of other Class members and they have selected experienced counsel. *See infra* § III.A. Finally, as detailed in the Complaint,[3] this action involves many common issues of law and fact, readily satisfying Rule 23's commonality requirement.

---

[3] On April 22, 2019, with Defendants' assent and the Court's approval, Lead Plaintiffs filed a Second Consolidated Amended Class Action Complaint (the "Complaint"). ECF No. 101.

Lead Plaintiffs also readily satisfy the "predominance" and "superiority" requirements of Rule 23(b)(3). *See infra* § III.B. Numerous common issues of law and fact relating to virtually every element of Plaintiffs' claims (*e.g.*, falsity, materiality, loss causation, reliance, damages and scienter) are subject to common proof and clearly predominate over any potential individualized issues. Given these elements, a class action is far superior to other available methods of fairly and efficiently adjudicating the controversy because: (1) potentially thousands of investors suffered damages as a result of Defendants' misconduct; (2) it is unlikely that investors whose damages were relatively small would file individual actions; (3) it is desirable to hear all such claims in one court; and (4) there is no difficulty in maintaining this litigation as a class action.

## II. SUMMARY OF ALLEGATIONS COMMON TO THE CLASS

Defendant Akorn develops, manufactures and markets generic and branded pharmaceuticals. Akorn's business depends on obtaining timely new product approvals from the U.S. Food and Drug Administration ("FDA"), which requires Akorn to comply with rigorous FDA data integrity and current Good Manufacturing Practices ("cGMP") regulations.

The Complaint alleges a common course of fraudulent conduct arising from Defendants' material misrepresentations and omissions during the Class Period that, *inter alia*, Akorn was in compliance with FDA data integrity and cGMP regulations and, consequently, valuable drugs in the Company's product pipeline would soon obtain FDA approval. Unbeknownst to investors, however, Akorn's senior executives and Board of Directors were aware of widespread and systemic data integrity problems throughout the Company. The evidence of the problems, and Defendants' knowledge of the extent of the problems, is overwhelming.[4] Defendants deliberately

---

[4] For example, the Delaware Chancery Court found that Akorn's internal audits identified "serious and pervasive data integrity problems that rendered Akorn's representations about its regulatory compliance sufficiently inaccurate. . ." *Akorn, Inc. v. Fresnius Kabi AG, et al.*, C.A. No. 2018-0300-JTL, 2018 WL 4719347, at *2 (Del. Ch. Oct. 1, 2018) (Laster V.C.). The Chancery Court was "forced to conclude" that

concealed this information from investors in order to, among other things, attempt to sell the Company to Fresenius Kabi AG ("Fresenius").

Defendants' misstatements and concealment of adverse facts caused Akorn's stock to trade at artificially inflated prices during the Class Period. The artificial inflation was corrected through a series of partial disclosures, as follows:

- On February 26, 2018, Fresenius disclosed it was conducting an investigation "into alleged breaches of FDA data integrity requirements relating to product development at Akorn, Inc." This disclosure caused Akorn's stock price to plummet 38.4%.

- On Sunday, April 22, 2018, Fresenius announced it was terminating its Merger Agreement with Akorn due to Akorn's widespread regulatory violations. This disclosure caused Akorn's share price to drop an additional 33.8%.

- On October 1, 2018, the Delaware Court of Chancery (the "Chancery Court") issued an opinion that further revealed the truth, finding, based on hundreds of confidential trial exhibits and sealed deposition testimony, that Akorn had indeed made material misrepresentations in the Merger Agreement regarding its regulatory compliance. This disclosure caused Akorn's stock price to fall an additional 58.7%.

- On January 9, 2019, Akorn disclosed it received a Warning Letter from the FDA relating to an inspection of its Decatur, Illinois facility, causing Akorn's stock price to fall by an additional 11.6%.

In total, in the wake of the revelation of Akorn's systemic data integrity problems, Akorn's share price dropped nearly 90% from $30.28 on February 25, 2018 (the day before the artificial

---

either quality concerns were not regarded "as a priority," by Akorn CEO Rai, or, alternatively, "[a]nother plausible and more alarming inference [wa]s that Rai consciously disregarded Akorn's quality issues, including its data integrity problems." *Id*. at *13, n. 112.

inflation was first partially removed) to $3.48 per share on January 9, 2019 (the closing price after Akorn disclosed the receipt of the Warning Letter).

As noted above, on October 1, 2018, the Chancery Court issued a 220-page Memorandum and Order concluding that "Fresenius validly terminated the Merger Agreement" with Akorn, "because Akorn's Regulatory Compliance Representations were untrue . . . and the degree of deviation would reasonably be expected to result in a [Material Adverse Event]." *Akorn*, 2018 WL 4719347, at *101. The extent to which Akorn is estopped from relitigating certain factual and legal issues resolved by the Chancery Court is yet another issue common to the Class.

## III.   ARGUMENT

To be certified, a putative class must satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, and also meet the requirements of at least one of Rule 23(b)'s subsections. *See* Fed. R. Civ. P. 23. In determining whether a class should be certified, the question is not whether plaintiffs will prevail on the merits, but rather whether the requirements of Rule 23 have been met. *Schleicher*, 618 F.3d at 687 ("The chance, even the certainty, that a class will lose on the merits does not prevent its certification."). Rule 23's requirements should be "liberally construed in favor of maintaining securities fraud class actions." *See, e.g.*, *Washtenaw*, 2018 WL 1535156, at *2; *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 455-66 (2013).

### A.   The Action Satisfies The Requirements Of Rule 23(a)

Rule 23(a) requires a showing that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative is typical of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." These prerequisites are satisfied here.

### 1.    Numerosity Is Established

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  In the Seventh Circuit, "[t]here is no bright-line test for numerosity, but courts have found that a class of forty is, or at least can be, sufficiently large to satisfy Rule 23(a)(1)." *Fox v. Riverview Realty Partners*, No. 12 C 9350, 2014 WL 1613022, at *2 (N.D. Ill. Apr. 22, 2014) (Kennelly, J.); *see also In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 565 (N.D. Ill. 2004) (plaintiff need not allege the exact number of members to satisfy numerosity).

Akorn's stock trades on the NASDAQ, and during the Class Period there were at all times at least 124 million shares of Akorn common stock outstanding, likely owned by hundreds or thousands of persons or entities.  *See* Tabak Rpt.,[5] Exhibit 3.  In securities fraud actions, courts in this District have found the numerosity requirement is satisfied when significantly fewer than 124 million shares are outstanding.  *See In re Groupon, Inc. Sec. Litig.*, No. 12 CV 2450, 2014 WL 5245387, at *5 (N.D. Ill. Sept. 23, 2014) (finding "sufficiently numerous parties" based on 40.25 million shares outstanding); *Neopharm*, 225 F.R.D. at 565 (16 million outstanding shares satisfies the numerosity requirement); *Tatz*, 2003 WL 21372471, at *5-6 (13 million shares outstanding satisfies the numerosity requirement).

### 2.    Commonality Is Established

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality exists where the class' claims share "a common nucleus of operative fact," such as where "defendants have engaged in standardized conduct towards members of the proposed class."  *Neopharm*, 225 F.R.D. at 565-66.  This element presents a "low

---

[5] The report of Lead Plaintiffs' expert, David I. Tabak, Ph.D., is cited herein as "Tabak Rpt." and is attached as Exhibit A to the Declaration of Andrew J. Entwistle, submitted herewith.

hurdle, easily surmounted." *Id.* Indeed, the Supreme Court has explained that "[e]ven a single [common] question" will suffice. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).

Here, Class members – all open-market purchasers of Akorn stock during the Class Period – are alleged to have been harmed by Defendants' public misstatements and omissions concerning Akorn's compliance with FDA regulations. Common issues include: (a) whether Defendants violated the Exchange Act; (b) whether Defendants issued misleading statements and otherwise omitted and/or misrepresented material facts during the Class Period; (c) whether Defendants did so knowingly or recklessly; (d) whether the price of Akorn shares were artificially inflated as a result of Defendants' alleged misrepresentations and/or omissions; (e) whether disclosure of Defendants' wrongdoing caused Class members to suffer damages; (f) whether the individual Defendants are "control persons" under Section 20(a) of the Exchange Act; and (g) whether Defendants are estopped from relitigating certain facts found by the Chancery Court. Courts have consistently held that these types of common questions satisfy the commonality prong. *See, e.g.*, *Roth*, 238 F.R.D. at 608 (common questions included whether defendants violated the federal securities laws and did so with scienter, and whether the company's stock price was artificially inflated); *Neopharm*, 225 F.R.D. at 566 (same).

### 3. Typicality Is Established

Rule 23(a)(3) requires that the class representatives' claim must have the "same essential characteristics as the claims of the class at large." *Silversman v. Motorola, Inc.*, 259 F.R.D. 163, 169 (N.D. Ill. 2009). This requirement is a low bar: a "class representative's injuries need not be identical to those of the class, but they must arise from the same common events, practices, or conduct and must be based on the same legal theory." *Washtenaw*, 2018 WL 1535156, at *5.

Here, the claims asserted by the proposed Class Representatives arise out of the same alleged facts and legal theories as the claims of other Class members. Gabelli, like the other Class members, purchased Akorn common stock during the Class Period after Defendants made actionable statements and omitted material facts. Gabelli, like the other Class members, purchased Akorn stock at prices artificially inflated by Defendants' misrepresentations, and suffered damages when the truth concealed by Defendants was thereafter disclosed to the market. Accordingly, Gabelli's claims are typical of the Class. *See, e.g.*, *Tatz*, 2003 WL 21372471 at *8 (class representative's claims were "typical of those of the class because he has alleged that he, like the class he purports to represent, relied to his detriment on the defendants' misrepresentations.").

### 4. Adequacy Is Established

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy under Rule 23(a)(4) "is composed of two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993); *see also Neopharm*, 225 F.R.D. at 566. "In order to establish this, class representatives must show that (1) their claims are not antagonistic to or in conflict with those of the proposed class, (2) they have sufficient interest in the outcome of the case, and (3) experienced, competent counsel represent them." *Washtenaw*, 2018 WL 1535156, at *5. This burden is "not difficult . . . . An understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient to meet this standard." *Motorola*, 259 F.R.D. at 169. Here, the adequacy prong is readily satisfied.

*First*, there is no conflict of interest or antagonism between Lead Plaintiffs and the Class they seek to represent. Indeed, as discussed above, Gabelli seeks to recover the same relief as other Class members, and asserts the same claims, based on the same facts, as other Class members.

*Second*, Lead Plaintiffs purchased millions of shares of Akorn common stock during the Class Period at artificially inflated prices and suffered substantial losses when the allegedly concealed truth was publicly revealed. Lead Plaintiffs have certified that they will not accept any payment for serving as class representatives beyond their respective *pro rata* share of any recovery, except as ordered or approved by the Court. *See* ECF No. 101-1 and 101-2 (PSLRA[6] certifications of Lead Plaintiffs). Lead Plaintiffs' interests are therefore directly aligned with those of the Class, and they have a considerable interest in obtaining a recovery for the Class.[7]

*Finally*, Entwistle & Cappucci, proposed Class Counsel, and BLB&G, proposed Class Liaison Counsel, are highly qualified and capable of prosecuting this action. Counsel's adequacy is demonstrated through its filing of detailed Complaints and the ongoing extensive discovery efforts in this action, as well as through counsel's historical success in prosecuting securities class actions. *See* ECF No. 18 at 8-12; ECF No. 19-3, ECF No. 19-4 (memorandum in support of appointment of lead counsel and liaison counsel and firm resumés submitted in support thereof).

---

[6] Private Securities Litigation Reform Act of 1995.

[7] Lead Plaintiffs are also institutional investors with billions of dollars under management, precisely the type of investors Congress sought to empower when enacting the PSLRA. *See* H.R. Rep. No. 104-369, at 34 (1995) (Conf. Rep.), *as reprinted in* 1995 U.S.C.C.A.N. 730, 733. Further, Lead Plaintiffs have already taken an active role in this litigation by retaining experienced counsel, reviewing drafts of pleadings, locating and providing documents and participating in strategic decisions and mediation efforts. *See* Declaration of Andrew J. Entwistle at ¶ 2; *see also Groupon*, 2014 WL 5245387, at *2 (adequacy satisfied because lead plaintiff "has already begun participating in discovery and has retained counsel who is highly experienced in securities class action litigation").

**B.    The Action Satisfies The Requirements Of Rule 23(b)(3)**

This action also satisfies the two prerequisites of Rule 23(b)(3), predominance and superiority.

**1.    Predominance Is Established**

The predominance inquiry asks whether "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This requirement is easily satisfied in securities fraud actions. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging . . . securities fraud . . ."); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814-15 (7th Cir. 2012) (same).

Notably, "[t]he issue for Rule 23(b)(3) purposes is not whether there are individual issues . . . but rather whether common issues predominate over any individual issues." *Fox*, 2014 WL 1613022, at *5; *see also Messner*, 669 F.3d at 815 ("[i]ndividual questions need not be absent"). The Supreme Court and Seventh Circuit have confirmed that Rule 23(b)(3) only requires that common questions "***predominate*** over any questions affecting only individual [class] members." *Amgen*, 568 U.S. at 467-69; *see also Messner*, 669 F.3d at 815 ("[t]he rule requires only that [any individual] questions not predominate over the common questions affecting the class as a whole.").

Determining whether common questions predominate over individual questions "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 809 (2011). The elements of Plaintiffs' claims based on violations of Section 10(b) of the Exchange Act are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton I*, 563 U.S. at 809-10

As the Supreme Court has explained, the elements of falsity, materiality, scienter, and loss causation all raise exclusively common questions of law and fact, supporting a finding of predominance. *See, e.g.*, *Amgen*, 568 U.S. at 467-69 ("materiality is a common question for purposes of Rule 23(b)(3)"); *Halliburton I*, 563 U.S. at 812; *Schleicher*, 618 F.3d at 685, 687 ("[f]alsehood and materiality affect investors alike"; determinations regarding loss causation "can be made on a class-wide basis"); *In re Bank One Sec. Litig./First Chicago S'holder Claims*, No. 00 CV 0767, 2002 WL 989454, at *7 (N.D. Ill. May 14, 2002) ("Defendants' alleged misstatements and omissions of material fact . . . predominate over any individual issue.").

Likewise, common issues of damages predominate over individualized issues. As with virtually all Section 10(b) actions, damages here are subject to the well-settled "out-of-pocket" methodology that can easily be applied class-wide using a common formula. *See* Tabak Rpt. at ¶¶ 56-64; *see also Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 751 (N.D. Ill. 2006) ("the measure of damages in a securities fraud action is not established by the difference between the plaintiff's purchase and sale prices of a security; rather, damages in a § 10(b) action are measured by the difference between the purchase price and its value if the truth had been known"). As Dr. Tabak explains, the "out-of-pocket" methodology calculates damages by using event studies of relevant dates, along with any necessary adjustments, to measure the amount of artificial inflation in Akorn common stock on each day of the Class Period.[8] *See* Tabak Rpt. at ¶¶ 56-64. Once the

---

[8] Whether and how to adjust the amount of artificial inflation for factors such as Akorn's stock price being artificially buoyed by the anticipated Fresenius merger are class-wide questions. Any required adjustment can easily be applied class-wide. *See Washtenaw*, 2018 WL 1535156, at *3 (rejecting argument "that [under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)] in order to attain class certification the plaintiffs must establish that their damages calculation will fully account for the impact of other intermediate disclosures and confounding information" because, "those are [merits] questions of loss causation or materiality").

daily inflation in Akorn stock is measured, calculating an individual investor's damages (based on its individual trades) is a purely "mechanical[]" task. *Schleicher*, 618 F.3d at 681 ("because each investor's loss usually can be established mechanically, common questions predominate and class certification is routine").

This out-of-pocket damages model is the universally-accepted method for calculating damages arising from claims under Section 10(b). *See, e.g.*, *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, No. 17-cv-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the ***standard method*** for calculating damages in virtually every Section 10(b) class action;" (collecting cases)). The out-of-pocket methodology "is entirely consistent with [Lead Plaintiffs'] theory of Section 10(b) liability . . . . evidenced by the fact that securities class actions routinely seek out-of-pocket damages for fraudulent misrepresentations." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105-6 (S.D.N.Y. 2016). Thus, "there is *no possibility* in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013).[9]

The reliance element is also a common question because all Class members are entitled to invoke the "fraud-on-the-market" presumption of reliance. *See Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 283-84 (2014) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988)). The "fraud-on-the-market" presumption is "a presumption that a public,

---

[9] Notably, several decisions in this District have questioned the extent to which *Comcast* applies to securities actions. *See, e.g.*, *Fox*, 2014 WL 1613022, at *6 (Kennelly, J.) (finding common issues of damages predominated in an action on behalf of a class of "shareholders who hold one type of stock in one company" and that the case "presents a vastly different situation from *Comcast*"); *Groupon*, 2014 WL 5245387, at *2-3 (*Comcast* is "inapposite in a securities fraud class action.").

material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283-84. When applicable, plaintiffs need not show that they actually read or relied on the misstatements at issue; it is enough that they relied upon the price of the security. *See Groupon*, 2014 WL 5245387, at *2 ("In a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones.").

Plaintiffs may invoke the fraud-on-the-market presumption of reliance by showing that the market for the securities is efficient.[10] When evaluating market efficiency, courts, including those in the Seventh Circuit, consider the five factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See, e.g.*, *Tatz*, 2003 WL 21372471, at *7; *Schleicher*, 2009 WL 761157, at *5. As set forth below, and detailed in Dr. Tabak's expert report, Lead Plaintiffs have made the requisite showing that Akorn common stock traded in an efficient market during the Class Period.

> i. **High Trading Volume Supports Market Efficiency (*Cammer* Factor 1)**

A high average trading volume supports a finding of market efficiency because it "implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one . . . ." *Id*. at 1292.

---

[10] Plaintiffs must also show that (i) the false statements were publicly made; and (ii) Plaintiffs' purchases were made after the alleged false statements. *See Halliburton II*, 573 U.S. at 275. Here, the alleged misstatements were all contained in public SEC or court filings, press releases and/or made during investor calls (*see* Complaint ¶¶ 191-274), and Lead Plaintiffs' PSLRA certifications to the Complaint show that each Lead Plaintiff purchased Akorn common stock after alleged misstatements. ECF No. 101-1; 101-2.

Here, Akorn common stock traded on the NASDAQ regularly and actively throughout the Class Period, with an average weekly trading volume of 4.73% of the shares outstanding. *See* Tabak Rpt. at ¶¶ 16-17. Thus, the first *Cammer* factor strongly supports a finding that Akorn shares traded in an efficient market during the Class Period.

### ii. Extensive Analyst Coverage Supports Market Efficiency (*Cammer* Factor 2)

Significant coverage of a stock by a large number of analysts supports a finding of market efficiency because it shows that the company is closely reviewed by investment professionals, who in turn make buy/sell recommendations to investors. *See Cammer*, 711 F. Supp. at 1286. Here, during the Class Period, financial analysts from at least twelve different firms followed and covered Akorn. *See* Tabak Rpt. at ¶¶ 18-21. Moreover, an average of 6.5 analysts provided earnings estimates for Akorn for each quarter during the Class Period. *Id*. This supports a finding of market efficiency. *See, e.g.*, *In re Northfield Labs.*, No. 06 C 1493, 2012 WL 366852, at *5 (N.D. Ill. 2012) (coverage by five analysts supports market efficiency).

### iii. Akorn's NASDAQ Listing And Numerous Market Makers Supports Market Efficiency (*Cammer* Factor 3)

The fact that a particular stock trades on a large market exchange *standing alone* can establish market efficiency. *See, e.g.*, *Groupon*, 2014 WL 5245387, at *2 ("It would be remarkable for a court to conclude NASDAQ is not an efficient market"). Because Akorn's stock trades on the NASDAQ, it "is undeniably a frequently traded stock in an efficient market." *Id.* at *2.

Further, under *Cammer*, "[t]en market makers for a security" – *i.e.*, firms willing to buy or sell the security continuously – "would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." 711 F. Supp. at 1293. Here, there were 149 market markers who traded Akorn's stock on the NASDAQ

stock exchange – a number far exceeding the *Cammer* benchmark. *See* Tabak Rpt. at ¶¶ 22-27. Thus, there is a "substantial" presumption of market efficiency.

### iv. Akorn's Eligibility To File An SEC Form S-3 Supports Market Efficiency (*Cammer* Factor 4)

Eligibility to file an SEC Form S-3 (short form registration), which is only available to certain established issuers, is also indicative of market efficiency. *See Cammer*, 711 F. Supp. at 1287. Indeed, companies "entitled to issue new securities using SEC Form S-3 would almost by definition involve stocks trading in an 'open and developed' market." *Id*. at 1277. Here, Akorn satisfied the conditions of Form S-3 eligibility throughout the entire Class Period. *See* Tabak Rpt. at ¶¶ 28-29.

### v. The Price Of Akorn Stock Reacted To New, Company-Specific Information (*Cammer* Factor 5)

While not required to establish market efficiency,[11] "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price . . . is the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer*, 711 F. Supp. at 1280-81, 1287.

Here, Lead Plaintiffs' expert, Dr. Tabak, conducted an event study analysis using a widely accepted methodology to determine whether Akorn's stock price reacted in an efficient manner to new information about the Company during the Class Period. *See* Tabak Rpt. at ¶¶ 30-42, Exhibit 8. Specifically, Dr. Tabak conducted a statistical analysis to test whether Akorn's stock price changed more on days when Company-specific news was reported to the public than on days

---

[11] *See Waggoner v. Barclays PLC*, 875 F.3d 79, 98-99 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018).

without Company-specific news. *Id*.[12] Dr. Tabak found that Akorn stock quickly incorporated and reacted to new, Company-specific information, and thus traded in an efficient market. *Id.*

Dr. Tabak also performed a separate analysis to confirm that Akorn stock prices promptly incorporated new, Company-specific information during the Class Period (including on the corrective disclosure dates) utilizing a well-accepted "autocorrelation" analysis. Tabak Rpt. at ¶¶ 49-54. In this regard, Dr. Tabak tested whether the price movements of Akorn's stock could be predicted on a given day based on the price movements one day prior – *i.e.*, whether there were trends or correlations in daily stock price movements. *Id*. Dr. Tabak found no statistically significant autocorrelation over the Class Period – a finding that weighs in favor of market efficiency. *Id.*

In sum, Dr. Tabak's empirical analyses "show that the market price of the defendant's stock tends to respond to pertinent publicly reported events" and as a result traded in an open, well-developed and efficient market throughout the Class Period. *See Halliburton II*, 573 U.S. at 280.

### vi. Other Considerations Support Market Efficiency

In addition to the *Cammer* factors, courts also consider additional factors in determining market efficiency, including: (i) the company's market capitalization; (ii) the bid-ask spreads for stock sales; and (iii) the public float (*i.e.*, the shares outstanding without counting insider-owned stock). *See, e.g.*, *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005). Here, each of these additional factors supports a finding of efficiency during the Class Period.

**Market Capitalization**: "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is

---

[12] As detailed in his report, Dr. Tabak conducted the test using five different methods to classify days with Company-specific news and days without such news. Each of the five tests found statistically significant evidence in favor of market efficiency.

a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman v. Sterritt,* 202 F.R.D. 467, 478 (N.D. Tex. 2001). During the Class Period, Akorn was well capitalized and had an average market capitalization of $2.8 billion. *See* Tabak Rpt. at ¶¶ 44-45.

**Bid-Ask Spread**: The bid-ask spread is the difference between the price at which investors are willing to buy and sell stock. *Krogman,* 202 F.R.D. at 478. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Id.* During the Class Period, Akorn's bid-ask spread was only $0.01 on average, and never exceed $0.03. This minimal bid-ask spread supports a finding of market efficiency. *See* Tabak Rpt. At ¶¶ 46-47, Exhibit 9.

**Float**: The public float for Akorn during the Class Period averaged 74.36% of the shares outstanding, which further demonstrates market efficiency because it indicates that the stock was liquid and investors had the incentive to examine the company's stock price to trade on any apparent mispricing. *See* Tabak Rpt. at ¶ 48.

In sum, Akorn's stock traded in an efficient market during the Class Period, thereby establishing the fraud-on-the-market presumption of reliance and confirming that common issues of reliance predominate. When combined with the other common issues of falsity, materiality, scienter, loss causation, and damages, Rule 23(b)(3)'s predominance element is readily satisfied.

### 2.    Superiority Is Established Under Rule 23(b)(3)

Rule 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." It cannot be seriously disputed that this requirement is met in the present case. *See, e.g.*, *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.,* 212 F.R.D. 400, 409 (E.D. Wis. 2002) (class actions are superior for securities fraud cases because they involve "numerous defrauded investors whose

claims are individually not large enough to make separate actions economically feasible."); *Bank One*, 2002 WL 989454, at *2 ("a class action is often the most fair and practicable means to address claims in securities cases.").

In assessing superiority, Rule 23(b)(3) enumerates the following factors that courts should consider: (i) the class members' interest in individually controlling the prosecution of separate actions; (ii) the extent and nature of any litigation concerning the claims already begun by class members; (iii) the desirability of concentrating the litigation in the particular forum; and (iv) the likely difficulties in managing a class action. Each of these factors is satisfied here.

*First*, because many Class members likely have small claims, the expense and burden of litigation makes it highly unlikely for them to file individual actions. *See Tatz*, 2003 WL 21372471, at *10 ("[C]lass members will benefit from class treatment because litigation costs are high and it is, therefore, unlikely shareholders will prosecute individual claims.").

*Second*, Lead Plaintiffs are aware of only one individual action currently pending or that has been filed.[13] This fact weighs in favor of class certification. *See Pope v. Harvard Bancshares, Inc.*, 240 F.R.D. 383, 392 (N.D. Ill. 2006).

*Third*, because individual Class members are likely located in geographically dispersed areas, it would be more efficient to resolve all claims in this forum, where Akorn also maintains its headquarters. *See Pope*, 240 F.R.D. at 392 ("Resolving all the putative class members' claims in one action in this jurisdiction, where the defendants are located, would be the most efficient way to resolve plaintiffs' claims.")

---

[13] The only related individual action is *Twin Master Fund, Ltd. v. Akorn, Inc.*, Civ. A. No. 19-cv-3648 (N.D. Ill.). Notably, the related *Wickstrom* and *Juan* actions – which were "stub period" class actions, not the individual "opt out" actions contemplated by Rule 23(b)(3)(ii) – have been consolidated into this action.

*Finally*, Lead Plaintiffs do not foresee any management difficulties that will preclude the Action from being maintained as a class action. Lead Counsel has substantial experience in securities class action litigation, and there is no reason to believe that counsel will experience unusual difficulty in the management of this litigation. *See Washtenaw*, 2018 WL 1535156, at *5.

Accordingly, a class action is "clearly the fairest and most efficient means by which" to adjudicate this action. *Washtenaw*, 2018 WL 1535156 at *5.

### C.     The Court Should Approve Lead Counsel As Class Counsel

The Court should appoint Lead Counsel (Entwistle & Cappucci) as Class Counsel and BLB&G as Class Liaison Counsel because they will fairly and adequately represent the Class. *See* Fed. R. Civ. P. 23(a)(4), (g)(1). Both are well-qualified to prosecute this action on behalf of Lead Plaintiffs and the Class, as demonstrated by their extensive experience in prosecuting and resolving complex securities class actions in courts throughout the United States, including jointly. *See* ECF No. 18 at 8-12; ECF No. 19-3, ECF No. 19-4. As Court-appointed Lead Counsel and Liaison Counsel, respectively, Entwistle & Cappucci and BLB&G have also demonstrated their willingness to commit substantial time and resources to representing the Class. Among other efforts, Lead and Liaison Counsel have investigated Akorn's wrongdoing, engaged in extensive discovery, retained experts in market efficiency, damages and FDA compliance, and assembled a dedicated team of experienced attorneys and staff to prosecute claims on behalf of Plaintiffs and the Class. The competence and experience of Lead and Liaison Counsel demonstrates that the requirements of Rule 23(a)(4) and (g) are satisfied, and Plaintiffs' choice of counsel should be appointed as Class Counsel.

## IV. CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully submit that the Court should certify this action as a class action pursuant to Rule 23, appoint Gabelli as the Class Representatives, and approve Gabelli's selection of Entwistle & Cappucci as counsel for the Class and BLB&G as Class Liaison Counsel.

DATED: July 5, 2019

Respectfully Submitted,

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
**ENTWISTLE & CAPPUCCI LLP**
500 W. 2nd Street, Suite 1900-16
Austin, Texas 78701
Telephone: (512) 710-5960
Email: aentwistle@entwistle-law.com

-and-

Joshua K. Porter (*admitted pro hac vice*)
Brendan J. Brodeur (*admitted pro hac vice*)
Andrew M. Sher (*admitted pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 20th Floor
New York, New York 10171
Telephone: (212) 894-7200
jporter@entwistle-law.com
bbrodeur@entwistle-law.com
asher@entwistle-law.com

*Lead Counsel for the Class*

Avi Josefson
John Rizio-Hamilton (*admitted pro hac vice*)
Abe Alexander (*admitted pro hac vice*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
875 North Michigan Avenue
Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880

Facsimile: (312) 794-7801
avi@blbglaw.com
johnr@blbglaw.com
abe.alexander@blbglaw.com

*Liaison Counsel for the Class*

## CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Brendan J. Brodeur, hereby certify that on July 5, 2019, service of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** was accomplished pursuant to ECF as to Filing Users and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.


*/s/ Brendan J. Brodeur*
Brendan J. Brodeur